IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 7, 2018

## STATE OF TENNESSEE v. TRACY DOUGLASS

**Appeal from the Criminal Court for Shelby County**
No. 13-03829      Chris Craft, Judge
_____

## No. W2017-01512-CCA-R3-CD
_____

A Shelby County jury convicted the Defendant, Tracy Douglass, of first degree premeditated murder, for which he received a life sentence. On appeal, the Defendant asserts that the trial court erred when it failed to declare a mistrial following the State's improper statements during closing argument. He also asserts that the evidence presented at trial is insufficient to support the jury's verdict. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT L. HOLLOWAY, JR., JJ., joined.

Harry E. Sayle, III, Memphis, Tennessee, for the appellant, Tracy Douglass.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Amy P. Weirich, District Attorney General; and Marianne L. Bell and Kenya N. Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

On September 12, 2012, a Shelby County homeowner found Chekisha Scott ("the victim") lying in his front yard on Cypress Drive with a gunshot wound to her forehead. Several days later, the police found the victim's Acura abandoned a half mile from where the Defendant resided on Meagher Street. Following a police investigation, a Shelby County grand jury indicted the Defendant for first degree premeditated murder.

At trial, the parties presented the following evidence:  L.C. Brewer testified that in September 2012, he lived on Cypress Drive.  During the evening of September 12, he was watching television in the bedroom when he heard a "pop or noise outside."  He looked out the window and saw a car drive off and a group of construction workers, who had been working on the house across the street, looking in the direction of his house.  Curious as to what the construction workers were looking at, he continued scanning his yard and saw what looked like a person lying in his front yard.  Mr. Brewer went outside and spoke with the construction workers to try to determine what had occurred.  Once he confirmed that there was a person lying in his yard, he called 911.  Mr. Brewer believed that it was a black male driving the car he had seen drive away, but he did not know the color or model of the car.

Lemarcus Webb, a Memphis Police Department ("MPD") officer, responded on September 12, 2012, to a call about a shooting on Cypress Drive.  He arrived at 9:49 p.m., before the paramedics.  First, he secured the scene to ensure safety and to preserve any evidence.  The victim was lying, face up, with half her body in Mr. Brewer's yard and her feet in the street.  Officer Webb described the victim as "obviously deceased" upon inspection.  He observed a single gunshot wound to the middle of the victim's forehead.  Officer Webb also found the victim's purse near her feet, and a nine millimeter spent shell casing near her body.  Officer Webb identified the victim using her identification found in the wallet inside the purse.

James Moore, an MPD officer, testified that on September 18, 2012, six days after this shooting, at around 9:30 p.m., he responded to a call about a suspicious vehicle or person.  After arriving at the location on Scott Street, he checked the area and found an Acura in a drainage canal below the street.  Officer Moore checked the vehicle identification number and found that the vehicle had been reported stolen.

Khatarri Burrow testified that she and the Defendant grew up together, and she considered him a family member.  In September 2012, the Defendant lived with Ms. Burrow and her three children at Ms. Burrow's residence on Meagher Street.  Ms. Burrow's allowed the Defendant to convert a "den" into a bedroom.  Ms. Burrow met the victim through the Defendant and knew her as the Defendant's girlfriend.

Ms. Burrow testified that in September 2012, the Defendant did not own a vehicle but that the victim drove a four-door silver Acura.  Ms. Burrow recalled one morning in September, the 12th or the 13th, when she returned home to the Meagher Street house from taking her children to school and found the victim's Acura "blocking" the driveway.  Ms. Burrow honked her horn, and the Defendant came outside and moved the Acura, allowing Ms. Burrow to park.  The victim was also at the house, and she and the Defendant left approximately twenty minutes after Ms. Burrow arrived.

2

Ms. Burrow next saw the Defendant "a day or so" later. She was sitting in her bedroom, and he offered to cut the grass. She declined the Defendant's offer to mow the lawn, saying that it was too late in the day to mow the lawn. He then asked if there was anything else he could do for her, and she again declined any help. Ms. Burrow observed a difference in the Defendant's behavior, describing him as acting "hyper about something" and that "he wouldn't be calm," which was inconsistent with his normal demeanor. Her impression was that the Defendant "wanted to stay busy."

Ms. Burrow testified that she inquired about the victim, and the Defendant told her that he and the victim had had an argument. He said that the victim "was mad about [the family] not liking her." Ms. Burrow found the Defendant's comment "confus[ing]" because she had never had any negative feelings toward the victim. The victim was concerned with how the family viewed "her mouth." The Defendant told Ms. Burrow that he had called the victim and left her voicemail messages but that she had not returned his calls. Ms. Burrow reassured the Defendant that, with time, the victim would "come around."

On September 19, 2012, Ms. Burrow received a phone call notifying her that a detective was at her home. She met with detectives at her residence and consented to a search of her residence. Ms. Burrow then went to the police station and provided a statement to the police. It was during the interview that she learned that the victim had died. Ms. Burrow stated that, at the time of these events, the Defendant had lived with her for approximately two months and had not worked during that time.

Ms. Burrow identified a photograph of her house and a photograph of a "ditch"[1] ("drainage canal") located to the side of her house. She also identified a photograph of an access road that led down to the drainage canal that was located across the street from her house. She described the drainage canal as lengthy, saying the drainage canal "goes from Hollywood to Binghamton." She confirmed that her mother lived in the house located across the street from her. On cross-examination, Ms. Burrow testified that she had never seen the Defendant with a gun or ammunition.

Roderick Robinson, Ms. Burrow's son, testified that he was fifteen years old at the time of this offense and lived with his grandmother across the street from his mother's residence on Meagher Street. He recalled that the Defendant lived with Ms. Burrow for approximately two months around the time of the victim's murder and that the Defendant did not own a car at that time. Mr. Robinson identified photographs of his mother's residence and the drainage canal located next to his mother's residence. Mr. Robinson

---

[1] Photographs of the drainage canal are included in the record. They depict a wide drainage canal, paved with concrete and designed to channel, when needed, large amounts of over-flow water.

described the drainage canal as "very big," recalling that he used to ride his bike in it as a child.

On September 12, 2012, as Mr. Robinson walked across the street from his grandmother's house to his mother's house, he saw the Defendant and the victim arrive at his mother's house in a silver Acura. The Defendant and the victim asked Mr. Robinson and his brother to spend the night at their home on Jackson because "somebody broke in the[ir] house the night before." The boys agreed, and the Defendant and the victim told the two brothers that, first, they were going to a nearby store to buy snacks for the boys and would return to take them home with them. When the Defendant and the victim left, the Defendant was driving the Acura.

Mr. Robinson washed the dishes at his grandmother's house and then waited outside for the Defendant and the victim to return. As he waited, he saw the silver Acura driving "pretty fast" down Meagher Street. He said it appeared that the Defendant was driving and there was "a shadow in the passenger seat." The car passed Mr. Robinson headed toward the drainage canal. Two or three minutes later the Defendant approached Mr. Robinson on foot. Mr. Robinson was standing in his grandmother's driveway. The Defendant was walking on Meagher Street from the direction of the drainage canal. Mr. Robinson testified that the Defendant had sweat on his face, and he asked Mr. Robinson "how he looked." In a joking manner, Mr. Robinson responded, "you look like you killed someone." The Defendant responded that he had shot "her" in the head. Mr. Robinson thought the Defendant was "playing," so he laughed and walked along with the Defendant.

Mr. Robinson noticed that the Defendant's white t-shirt had "specks on it." He described the "specks" as dark red in color and stated that the specks had not been on the Defendant's shirt earlier in the evening. Mr. Robinson walked with the Defendant toward the store but turned around when he saw "a lot of police cars" and went home. Mr. Robinson saw the Defendant again that night at his mother's house. The next day, police officers spoke with Mr. Robinson. He stated that he did not tell them the truth initially but, on September 19, 2012, he went to the police department and gave a truthful statement. On cross-examination, Mr. Robinson testified that he had never seen the Defendant with ammunition or a gun.

Bruce Scott, Ms. Burrow's son, testified that he met the victim in the beginning of September in his home on Meagher Street. On September 12, 2012, the Defendant and the victim came to the Meagher Street house and invited Mr. Scott and his brother, Mr. Robinson, to spend the night at the victim's home at the Jackson Street rooming house. Mr. Scott described the Defendant and the victim as affectionate and "happy in love." The victim told Mr. Scott that she was going to see her mother and would return to the

4

Meagher Street house to take the boys to her residence for the night. This was the last time Mr. Scott saw the victim.

Thirty or forty-five minutes later, Mr. Scott saw the Defendant quickly walking toward the Meagher Street house. The Defendant passed the boys, who were leaving the house to go to a nearby store for their mother. He said, "[H]ey, . . . what's up, y'all," and kept walking. The Defendant went inside the Meagher Street house, "washed up," changed his clothing, and came back outside. Mr. Scott told the Defendant that he and Mr. Robinson were walking to a nearby store, and the Defendant joined them.

Mr. Scott recalled that at the store, he and the Defendant were waiting outside for Mr. Robinson, who was still inside the store, when he noticed "a whole bunch of flashing lights" about three or four blocks away. The Defendant said, "I need to go see what happened," so Mr. Scott, Mr. Robinson, and the Defendant walked toward the emergency response vehicles. Mr. Scott said that initially they all walked the same pace but that gradually the Defendant began to fall behind. Mr. Scott, Mr. Robinson, and the Defendant stood across the street, a short distance away, and observed "all the lights, news reporters, and all of that outside."

Mr. Scott testified that he could see a female lying on the ground but from his location he was unable to identify whether he knew the person. They stood across the street for ten or fifteen minutes before walking back to the Meagher Street house. Mr. Scott described the Defendant's demeanor as "fidgety" and "nervous." Mr. Scott recalled asking the Defendant about why they were not spending the night at the victim's home, and "he never real[ly] gave [them] a[n] answer. He just like brushed it off," telling Mr. Scott that the victim was at her mother's house.

On cross-examination, Mr. Scott agreed that he had never seen the Defendant with a weapon or ammunition. Mr. Scott recalled that night when the Defendant and the victim came to the Meagher Street house, the Defendant saying to the victim, "I told you they weren't going to be judgmental about your mouth." Mr. Scott said that the victim appeared to be embarrassed by the Defendant's comment but the victim "play[ed] it cool." The next morning, Mr. Scott overheard the Defendant telling his mother and his uncle about a disagreement he had had with the victim.

Elizabeth Hodges, the victim's mother, testified that the victim was thirty-four years old at the time of her death and the mother of four children, three girls and one boy. Ms. Hodges lived in Chicago, Illinois, but would visit Memphis "occasionally." In August 2012, on one of her trips, she was staying at her husband's residence on Chelsea Avenue. Ms. Hodges recalled that, at that time, the victim lived "on Jackson in a yellow

5

rooming house." It was during this visit that the victim first introduced the Defendant to Ms. Hodges.

Ms. Hodges returned to Memphis again in September 2012. On the morning of the victim's death, the victim visited with Ms. Hodges. Ms. Hodges was concerned that the victim was not being truthful with another man, "James," about her relationship with the Defendant. Ms. Hodges encouraged the victim to "choose" between the two men, and the victim agreed to do so. Later that day, the victim returned with the Defendant. The victim's room at the Jackson Avenue rooming house had been burglarized, and she and the Defendant were planning to ask some family members to stay with her. The couple visited with Ms. Hodges for a while and, when the Defendant and the victim prepared to leave at around 6:00 p.m., the Defendant asked Ms. Hodges's husband, Raymond Rogers, if the Defendant could leave his gun with him because the victim was scared of guns. The victim's fear of guns stemmed from the shooting death of her father. The Defendant gave the gun to Mr. Rogers, who placed it under the couch. Ms. Hodges noticed that the Defendant had a bottle of "Amsterdam" with him at the time.

Several hours later, the Defendant called Ms. Hodges asking for the victim. The Defendant said that he and the victim had gotten into an argument over a comment one of his family members had made in reference to "some decayed teeth." The Defendant told Ms. Hodges that the victim had told him "I don't want you anymore." Ms. Hodges advised the Defendant that the victim "argues a lot and stuff like that" but to "give her some air or room." The Defendant responded, "I can't do that." Shortly before 9:00 p.m., the Defendant returned to the Chelsea Avenue house with another bottle of "Amsterdam." The Defendant retrieved lemonade from a Styrofoam cup and asked Mr. Rogers for the return of his gun. Ms. Hodges's asked the Defendant where the victim was and the Defendant responded "out there." After getting the gun, the Defendant left. On cross-examination, Ms. Hodges's testified that "James" had given the victim the silver Acura.

Jared Filsinger, an MPD officer, testified that at 4:00 a.m. on September 12, 2012, he responded to a report of a burglary. When he arrived, he spoke with the victim who said that she saw someone inside her room, she sprayed some mace at the intruder, and then called the police. Officer Filsinger said that the victim's residence located on Jackson Avenue was approximately a block east of Cypress Drive.

Vennes Owens testified that she worked for the District Attorney General's Office in the Criminal Investigation Division as a criminal investigator. Investigator Owens stated that, in preparation for trial, she photographed the drainage canal where the police recovered the Acura. She said that she entered the ditch from an access road located across the street from the Meagher Street residence. She said that the Acura had been

recovered approximately a half mile from the drainage canal entrance on Meagher Street. She walked the distance between the locations at a "slow pace" and it took her "about" ten minutes to walk. She estimated that a person, if running, could cover the distance in five minutes or less.

Trey Norris, an MPD officer, testified that he detained the Defendant on September 19, 2012, and took him to the Defendant's residence on Meagher Street. The Defendant consented to a search of his room, a "den kind of area." In this room, officers found three magazines that went with three different weapons and a box of 40-caliber bullets. One of the magazines was a nine millimeter magazine, another was for a MP5 assault rifle, and the last was for a Taurus handgun. The officer also found paperwork bearing the Defendant's name in the room.

Erica Curry, a forensic pathologist, testified as an expert witness in the field of forensic pathology. Dr. Curry performed the autopsy of the victim. Dr. Curry observed a gunshot wound to the victim's forehead that had some stippling around the wound, indicating the gun was fired approximately two and a half to three feet from the victim's head. Based upon the injuries incurred, Dr. Curry opined that the injuries resulted in "immediate death." Dr. Curry recovered the bullet and fragments from the victim's brain. A toxicology report showed the presence of pseudoephedrine, diazepam, alprazolam, and methadone.

The defense presented the following proof: The Defendant testified that, at the time of the victim's death, he had been dating her for approximately a month, and she lived in a rooming house located on Jackson Avenue. The Defendant recounted the events leading up to the victim's death. On the night of September 11, 2012, he stayed with the victim, who was the only occupant at the rooming house at that time. At 3:00 or 4:00 a.m., he woke up to the victim's screaming that someone was in the room. The Defendant could not make out the intruder's face due to the dark but could see a silhouette in the doorway. He said the intruder was a black male. He leapt out of bed, closed the door and shoved a chair behind the door to block entry. The Defendant called the police who arrived in about five minutes.

The Defendant recalled that the victim was "very scared" and that he felt shaken by the experience as well. At around 5:00 a.m., the Defendant and the victim went to the Chelsea Avenue residence and told Ms. Hodges about the intruder. They stayed briefly before going to the Meagher Street house for an hour or two. The Defendant and the victim then returned to the Chelsea Avenue residence, where they remained for "a few minutes" before leaving again. By this time it was around noon, and the Defendant and the victim returned to the house on Meagher Street. The Defendant stayed at the

7

Meagher Street house while the victim drove to South Memphis to buy a gun for protection.

The victim returned to the Meagher Street house, and she and the Defendant drove to the Chelsea Avenue house to give the gun to Mr. Rogers. After giving the gun to Mr. Rogers, the couple drove to Frayser to look at a house. They then returned to the house on Meagher Street where the Defendant met with "Mr. Tedo Smith" "the head of our record label." The two drove around for a while, and the Defendant told Mr. Smith about the intruder while they drove. When the Defendant returned to the Meagher Street house, the victim was not there. The victim returned at around 3:00 p.m., and the two went to the Jackson "rooming house" and met with the landlord.

The Defendant testified that the victim planned to stay with her mother, and he was going to stay at the Meagher Street house on the night of September 12, 2012. He rode with the victim to the Chelsea Avenue house. The victim was crying, due to "a current incident that happened at" the Meagher Street house. To avoid her mother's seeing her crying, she decided to stay at the Jackson "rooming house." The Defendant told the victim that he did not want the victim to stay there alone because of the break-in unless she had a gun. The victim agreed, so the Defendant retrieved the gun from Mr. Rogers and put it in the trunk of the car. She then dropped the Defendant off near Meagher Street, and the Defendant walked to the house.

The Defendant described the "current incident" that upset the victim. He said that Ms. Burrow told the victim she was beautiful and that she should not "worry about her mouth." He had warned his family not to mention the victim's teeth because the victim was "insecure about her mouth." The Defendant unsuccessfully attempted to calm the victim, but the victim was very sensitive about her mouth. She was so angry about the mention of her mouth that she dropped the Defendant off before reaching the Meagher Street house. As the Defendant walked the remaining distance to the house, he saw Mr. Robinson. He denied telling Mr. Robinson that he had killed the victim. The Defendant went inside the Meagher Street house where he saw Ms. Burrow. He spent fifteen to twenty minutes texting and calling the victim with no response from her.

The Defendant asked Mr. Robinson to walk with him to a nearby store to buy "Black and Milds" and then to the victim's "house." He agreed and Mr. Scott joined them. They stopped at the store and then walked to Bigg Street and North Parkway where they saw blue flashing lights and numerous police cars. The Defendant told Mr. Robinson and Mr. Scott, "we ain't going down there," but Mr. Scott stayed to watch while the Defendant and Mr. Robinson walked to the victim's residence. The victim's Acura was not parked at the Jackson Avenue rooming house, so they returned to the Meagher Street house. The Defendant said he was at the Meagher Street house for

8

approximately thirty minutes before he went to a bank in Frayser at around midnight. After returning from the bank, he spent the remainder of the night across the street from the Meagher Street house at Ms. Burrow's mother's house.

The Defendant testified that he did not see the victim again after she dropped him off, and he denied killing her. He denied abandoning the victim's vehicle in the drainage canal or having ever been in the drainage canal on the evening of September 12. He said that he did not learn of the victim's death until his arrest on September 19, 2012.

On cross-examination, the Defendant agreed that in the summer of 2012, he had no place to live, no job, and no car. He agreed that he asked Ms. Burrow if he could stay at her house on Meagher Street, and when Ms. Burrow agreed, he moved into the den. The Defendant met the victim in August 2012, and the two became "serious pretty quickly." The victim allowed the Defendant to drive her silver Acura, and he occasionally spent the night with her at the Jackson Avenue rooming house. About the victim's purchase of the gun, the Defendant said that the victim did not want her mother to know that she owned a gun, so she asked the Defendant to say it was his gun. The Defendant said that he gave the gun to Mr. Rogers and "told him to put it up."

The Defendant agreed that on the night of September 12, 2012, he had a "brief conversation" with Mr. Robinson and Mr. Scott about their spending the night but that the victim was not part of the conversation. He said that Mr. Robinson and Mr. Scott lied in their testimony about that discussion. The Defendant denied telling Sergeant Quinn during an interview that he and the victim got into an argument at the Meagher Street house about her teeth and that she left him there. He then agreed that he made the statement but denied saying that the couple argued. The Defendant testified that Mr. Robinson lied when he testified that the Defendant stated that he had shot the victim. He further accused Ms. Burrow of lying in her statement to the police and her testimony before the jury. He also denied telling Ms. Hodges that he had bought a gun in South Memphis. The Defendant agreed that he had been convicted in October 2010 of felony burglary.

In rebuttal, the State re-called Sergeant Quinn, who testified that he interviewed the Defendant on September 19, 2012. During the interview, the Defendant stated that because of the break-in at the Jackson Avenue rooming house, he gave the victim $40.00 to buy a gun. Sergeant Quinn confronted the Defendant with Ms. Hodges's and Mr. Rogers's assertions that the victim was afraid of guns, and the Defendant responded that Mr. Rogers was lying. The Defendant told Sergeant Quinn that he gave a nine millimeter gun to Mr. Rogers while at the Chelsea Avenue house but then retrieved it before leaving. He and the victim then went to "his parent's house," where the couple got into an argument over the Defendant mentioning the victim's teeth, and the victim left.

9

After hearing this evidence, the jury convicted the Defendant of first degree premeditated murder, and the trial court entered a judgment of life in prison. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that the trial court erred when it failed to declare a mistrial following the State's improper statements during closing argument and that the evidence presented at trial is insufficient to support the jury's verdict. The State responds that the Defendant has waived his first issue by failing to request a curative instruction or a mistrial at the time of closing argument and that the State presented sufficient evidence that the Defendant committed first degree premeditated murder.

### A. Mistrial

The Defendant asserts that the trial court abused its discretion by failing to declare a mistrial based upon the State's "inappropriate and highly prejudicial" statements in closing argument. The State responds that the Defendant has waived review of this issue because he failed to request a curative instruction or request a mistrial at the time.

During closing argument, the State talked about the evidence as it related to the elements of first degree premeditated murder. The prosecutor then stated:

> Sometimes we know why a crime happens, and a lot of times we don't. We don't. There's a lot of senseless violence. Just a couple of weeks ago a man was on facebook and posted live a killing of shooting a grandfather in the middle of the forehead had - -

Defense counsel objected and the following exchange occurred:

| Defense Counsel: | I object to the reference to a similar crime happening in reference to this argument, Your Honor. It's improper. |
|---|---|
| Trial Court: | Okay. I guess the question is going to be whether or not that's a reasonable inference from the facts. You have to comment of course on the law and the evidence in this case - - |
| State: | That's what - - |

10

| | |
|---|---|
| Trial Court: | - - I didn't know where you were going with that. |
| State: | That's fine. |
| Trial Court: | Let's change course. |
| State: | Okay. |

The State continued:

> Trying to figure out exactly why something happens, exactly why certain crime happens is sometimes absolutely futile. Why, because murder makes no sense. It is never the solution to any argument or ending any relationship. So to try and figure out in this particular case why the defendant did what he did, would be to ask you to think like him, to think like somebody who would shoot and kill someone else. . . . A motive for all of its talk on TV shows and movies is not an element of the crime of first degree murder. And the State doesn't have to prove motive.

The Defendant did not request a curative instruction or a mistrial. In his motion for new trial, the Defendant argued, "[T]he State improperly argued the facts of another high profile case in their closing argument. Said argument was not only improper, but highly prejudicial." No evidence was presented at the motion for new trial, and defense counsel made no argument, relying on his written motion. The trial court found that the argument did not prejudice the Defendant and that he was not entitled to a new trial.

To begin our analysis, we first note that the Defendant frames his argument as an assignment of error to the trial court for its failure to, *sua sponte*, declare a mistrial as a remedy when the Defendant objected to the State's closing argument. While the State argues on appeal that the Defendant waived the issue for failing to request a mistrial, we conclude that the Defendant sufficiently preserved the issue for our review; however, because the Defendant merely objected to the State's closing argument and did not specifically request a mistrial as a remedy, we will consider whether the State committed prosecutorial misconduct egregious enough to require a new trial for the Defendant.

"[A]rgument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Tennessee courts give great latitude to counsel arguing their cases to the jury. *Id*. Thus, "trial judges have wide discretion in controlling the argument of counsel, and their action will not be reviewed absent abuse of that discretion." *Id*. However, the comments of counsel during closing

11

argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *State v. James Rae Lewter*, No. M2010-01283-CCA-RM-CD, 2011 WL 1197597, at *4 (Tenn. Crim. App. Mar. 31, 2011) (quoting *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007)), *no perm. app. filed*.

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). To establish reversible error and succeed on a claim of prosecutorial misconduct, the appellant must show that "the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)).

When determining whether the argument affected the jury's verdict, we consider the following five factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App .1976).

The Defendant complains that the State's comments about a similar offense were highly prejudicial. The Defendant objected and, during the bench conference, the trial court reminded the State that it could only comment on the law and the evidence in this case. The State agreed and approached the same issue without an example, explaining to the jury that motive is not required and often difficult to find in senseless acts of violence. In addition, in its jury charge the trial court instructed the jury that "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." The jury is presumed to have followed the trial court's instructions. *State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994).

12

The State's comments were improper, but there is nothing about the comments that was "so inflammatory or . . . so improper that it affected the verdict to [the Defendant's] detriment," especially in light of the case as a whole. *State v. Farmer*, 927 S.W.2d at 591. We conclude that the Defendant is not entitled to relief because the case against him was strong and the State did not appear to have any nefarious intent.

## B. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support a finding of guilt beyond a reasonable doubt. He argues that, because there is no eyewitness to the shooting, the evidence is insufficient. The State responds that the evidence was sufficient to show that the Defendant intentionally shot and killed the victim following an argument and hid the victim's car in a drainage canal near where he was staying. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues

raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

First degree murder is defined as a "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2014). Premeditation refers to "an act done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d) (2014). Whether the defendant premeditated the killing is for the jury to decide, and the jury may look at the circumstances of the killing to decide that issue. *Bland*, 958 S.W.2d at 660. The Tennessee Code states that, while "the intent to kill must have been formed prior to the act itself," that purpose need not "pre-exist in the mind of the accused for any definite period of time" for a defendant to have premeditated the killing. T.C.A. § 39-13-202(d) (2014).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006). The following factors have been accepted as actions that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness immediately after the killing. *Bland*, 958

14

S.W.2d at 660.  In addition, a jury may consider destruction or secretion of evidence of the murder and "the planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing." *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); *State v. Halake*, 102 S.W.3d 661, 668 (Tenn. Crim. App. 2001) (citing *State v. Gentry*, 881 S.W.2d 1, 4-5 (Tenn. Crim. App. 1993)). Also, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

The evidence, considered in the light most favorable to the State, shows that the Defendant and the victim were dating.  The victim was last seen alive at the Meagher Street house with the Defendant.  The two left in the victim's car with the Defendant driving.  Shortly before the victim's murder, the Defendant retrieved a gun from the victim's step-father.  L.C. Brewer testified that he heard gunfire and then found the victim lying in his yard.  He also observed a male drive away in a car.  According to the Defendant, the Defendant and the victim argued over comments Ms. Burrow had made to the victim about her mouth.  The Defendant returned to the Meagher Street house alone, on foot, walking from the area of the drainage canal where the victim's car was ultimately found.  The Defendant was sweaty and wearing a white t-shirt with dark red specks on it.  The Defendant told Mr. Robinson that he had shot the victim, and the victim was found a short distance from the Meagher Street house dead, shot once in the forehead.  Although the Defendant acted "fidgety" and "nervous," following the shooting, he walked to a nearby market and stood by and observed the crime scene before returning to the Meagher Street house.  The Defendant's procurement of a weapon shortly before the victim's murder, his calm demeanor following the murder, and his efforts to conceal the victim's vehicle are all evidence from which a rational jury could infer premeditation.  We conclude that the State presented sufficient evidence upon which a jury could conclude beyond a reasonable doubt that the Defendant committed the first degree premeditated murder of the victim.

The Defendant's complaint with regard to there being no "witness to the actual shooting" appears to be an attack on the circumstantial evidence in the case.  A conviction may be based solely upon circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973), if the circumstantial evidence is sufficient for a finding of guilt beyond a reasonable doubt.  *Pruitt v. State*, 460 S.W.2d 385 (Tenn. Crim. App. 1970). The evidence as shown above is sufficient for the jury to find guilt beyond a reasonable doubt.  The jury heard all the evidence, determined the credibility of the witnesses, and accepted the State's theory of the case.  The evidence supports their verdict.  It is the function of the jury to resolve questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual disputes raised by the evidence. *State v. Willis*, 496 S.W.3d 653, 749 (Tenn. 2016) (citing *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990)).  A reasonable juror

could infer from the Defendant's procurement and possession of a gun, his presence with the victim, his argument with the victim, and his proximity and access to the drainage ditch that he intentionally and with premeditation shot and killed the victim. The evidence, when viewed in the light most favorable to the State, is sufficient to sustain the Defendant's conviction for the first degree premeditated murder of the victim.

### III. Conclusion

Based on the foregoing authorities and reasoning, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE